**UNITED STATES,**

v.

**William GARRISON, Defendant.**

**No. 07cr10142–NG.**

United States District Court,
D. Massachusetts.

May 20, 2008.

William M. White, Jr., Law Offices of William M. White, Jr. and Associates, Boston, MA, for Defendant.

John A. Wortmann, Jr., United States Attorney's Office Boston, MA for Plaintiff.

### *SENTENCING MEMORANDUM*

GERTNER, District Judge.

William Garrison ("Garrison") pled guilty to a three-count Information charging him with Distribution of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1) (Counts 1–3). According to Garrison's plea agreement, he was responsible for sales of between 5 grams and 20 grams of crack cocaine to undercover officers of the Boston Police Department—a cumulative quantity derived from three sales of small amounts of crack cocaine over the period of a single week, November 30 to December 5, 2006. Garrison was the only defendant named in the information. (He waived indictment at the time he pled guilty.) As such, the Presentence Report ("PSR") and the parties' arguments focused on him. In the PSR, under the category "related cases," the probation officer wrote "none."

The fact was, however, that Garrison was one of 21 people who were arrested by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), DEA's Mobile Enforcement Team ("DEA") and the Boston Police Department ("BPD") in a single sweep in the fall of 2006.[1] All the arrests were of residents of the area of Greenwood, Harvard, Hendry, and Bernard Streets in Dorchester.[2] Some of the defendants were allegedly involved in vio-

---

1. To its credit, the Probation Office included this information in the section of the PSR entitled "Background."

2. *See* Shelley Murphy, *21 Linked to Dorchester Gang Charged with Drug Dealing*, Boston Globe, Jan. 11, 2007, at 3B, *available at* http://

www.boston.com/news/local/articles/2007/01/11/21_linked_to_dorchester_gang_charged_with_drug_dealing/ ("Globe Article").

lence, gun possession and gangs,[3] but no such accusations were made against Garrison. All 21 of those arrested were charged with cocaine distribution.[4] In a regime that purports to value similar treatment for similarly situated individuals, the fact that Garrison's sentencing could have proceeded without considering the other men involved in the same sweep was troubling. Surely some of these individuals—non-violent street dealers, arrested at or near the same time, part of the same investigation—were presumptively similarly situated with Garrison. While the Federal Sentencing Guidelines did not ask about these other individuals—clearly, a flaw—I did.

As a result of the passing reference to the "sweep" in the PSR, the Court determined which defendants had been arrested at the same time, what their sentences were (if they had been sentenced), reviewed the dockets (statements of reasons, transcripts, plea agreements and the parties' memoranda), prepared a chart (attached as Exhibit A) and sought to compare the disposition in each case with the proposed disposition in Garrison's case.[5]

The Guidelines define "similarly situated" only with reference to the particular guideline categories. If a defendant had an offense level of 14 and a criminal history of I, the Guidelines assumed that you were similarly situated to other 14s and Is. But in this case—and perhaps many others—that is a false assumption. Similarly situated with respect to the Guideline categories does not necessarily mean similarly situated with respect to the defendant's actual role in the criminal endeavor or his real culpability. The individual supplying the drugs, for example, could have been a first offender, with a criminal history I, not because he had been crime-free all of his life but because he did not "do" street drug deals and thus rarely encountered government agents. And the reverse, an offender with a high criminal history score, could have been caught in this drug sweep even when his drug dealing was episodic, when he had tried to change the direction of his life. The numbers—the Guideline computation—could mask real differences between offenders, in effect, a "false uniformity." Sandra Guerra Thompson, *The Booker Project: The Future of Federal Sentencing*, 43 Hous. L.Rev. 269, 275 n. 25 (2006); Michael M. O'Hear, *The Myth of Uniformity*, 17 Fed. Sent'g Rep. 249 (2005). It is especially important, now that the Guidelines are advisory,[6] that judges are charged with looking beyond the Guidelines categories and that they know what their colleagues have done in comparable cases. The new discretion will

---

**3.** *See id.*

**4.** *Id. See also, e.g.,* Indictment, *United States v. Smoak*, No. 07CR10005–NMG (D.Mass. filed Jan. 4, 2007) (document # 1) (charging four defendants only with violations of 21 U.S.C. § 841(a)(1) for distribution of cocaine base).

**5.** It was fortunate that much of this information was available on the public docket; Assistant United States Attorney John Wortmann helped fill in some of the rest. If a given defendant had not been sentenced, I would have called for that individual's Presentence Report and permitted counsel access only to the criminal history and offense conduct sections.

**6.** *Kimbrough v. United States*, —— U.S. ——, ——, 128 S.Ct. 558, 574, 169 L.Ed.2d 481 (Dec. 10, 2007); *United States v. Booker*, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). As I noted in *United States v. Jaber*, 362 F.Supp.2d 365, 367 (D.Mass.2005), " 'advisory' does not mean a regime without rules, or a return to the standardless sentencing which preceded the [Sentencing Reform Act]. Nor does it mean slavish application of the Guidelines under the guise of fair 'consideration,' an approach which is now unconstitutional." " 'Advisory' means something in-between . . . ."

be influenced, as it should be, by the precedents of the court: a true common law of sentencing.

In fact, in reviewing the cases of other similarly situated individuals—non-violent, street—level dealers of crack-many of my colleagues did in fact exercise their discretion in varying the Guidelines sentences. The quantity calculations for these offenders under the Guidelines did not reflect meaningful differences in culpability; the quantity calculations more often reflected the happenstance of when the police happened to be on a given corner or for how long the police surveilled them. Their criminal history scores were problematic, because the Guidelines make no distinction between offenders with violent records and those without, those with multiple minor offenses which lead to the same "score" as a few very violent ones. The drug involved was crack cocaine, which the Guidelines have singled out for harsh treatment, without empirical support. *See Kimbrough*, 128 S.Ct. at 574–75. And these were offenses over which the state had concurrent jurisdiction. Had these low-level street dealers been sentenced in state court, the punishment range would likely have been far less severe.

Garrison's sentencing was delayed to give the parties an opportunity to consider the issues raised by the sentencing of other individuals in the same "sweep." Some individuals had already been sentenced by other judges; some were about to be sentenced. The Court directed the government (and Probation) to confirm the criminal history, the offense level and the sentencing of each defendant in the related cases.

I will first describe Garrison's background without reference to the Guidelines, as has been my practice.[7] I will then address the Guideline computations—and the reasons why the Guidelines should not be followed here, both because of the circumstances of this particular case and the Guidelines' inaccurate equation of drug weight and culpability. Finally, I will address the appropriate sentence length under 18 U.S.C. § 3553(a).

## I. *BACKGROUND*

Garrison is a 27–year–old–man with a supportive family. His mother and father divorced when he was eight. He lived with his mother for the most part, seeing his father on weekends until his father moved to California. He spent a short amount of time with his father in California before returning to Boston when his father remarried. With a serious alcohol and drug problem, Garrison dropped out of school at the 11th grade, and had sporadic employment after that.[8] When he was not employed, he was supported by his grandmother, and lived in the house she owns. He had no skills, no high school diploma, and was frequently under the influence of alcohol. The defendant reported that, in general, on Fridays and Saturdays, he drank three to four glasses of cognac and became intoxicated. Since the age of 15 or

---

**7.** *See, e.g., United States v. Ribot,* 97 F.Supp.2d 74, 76 (D.Mass.1999).

**8.** The defendant reported that between 2003 and 2007 he was employed by Pro Event, a company that provides staff to set up staging and lights for events. He reported that he usually worked more than 40 hours per week and earned $13 per hour. The government suggested that the number of hours was closer to 10 hours per week. In 2000 to 2003, the defendant was unemployed, supported by his grandmother. Between 1999 and 2000, the defendant worked at Walgreens as a pharmacy technician, but this employment could not be verified. Between 1996 and 2000, he was employed by Anthony Perkins Community Center in Dorchester, Massachusetts, as a camp counselor. The organization indicated that it would consider reemploying the defendant.

16, he has used marijuana. By the age of 18, he began smoking it daily, usually about five to six "blunts" or "joints," and continued until his arrest for the instant offense.

Garrison's mother and grandmother were in the courtroom during the sentencing, and continued to support him notwithstanding these charges. They described him as well liked and helpful to them and other elderly residents in his neighborhood. They emphasized that however troubling his record was, he had steered clear of the violence that had afflicted his neighborhood.

Garrison has been involved in a romantic relationship with one woman, with whom he has a son—born while he has been detained on these offenses. He previously had a relationship with another woman, by whom he has two children. Both women have continued to support him, and by all accounts, he has been a presence in his children's lives, seeing them regularly and providing them with money as needed.

The offenses in question took place in a one week period. Garrison was initially approached by one of the undercover officers involved in the sweep. The sale of three small amounts of crack cocaine followed. No threats of violence were involved. No guns were mentioned. The officers knew nothing about Garrison, how often he was in that area, how much he relied on drug income, rather than his family's economic support or his sporadic employment. The knew him only from their snapshot of him on a street corner.

## II. GUIDELINE COMPUTATIONS

The defendant distributed 2 grams of crack on November 30, 2006, 1.8 grams on December 1, 2006, and 2.1 grams on December 5, 2006—a total of a little less than 6 grams. Pursuant to U.S. Sentencing Guidelines Manual ("Guidelines") § 2D1.1(c)(8), since the amount of cocaine base was at least 5 grams, but less than 20, the base offense level was 24. With an adjustment for "acceptance of responsibility," *id.* § 3E1.1(b), his adjusted offense level was 21.[9]

Garrison's criminal history score, however, was the very highest under the Guidelines—a score of 14, placing him in category VI.

The guideline range was 77–96 months. The government recommended a low-end guideline sentence. The defendant recommended a sentence no greater than 24 months.

I needed to examine the Guidelines in greater detail to ascertain whether a Guideline-range sentence was appropriate for this defendant. As noted above, the skeletal Guidelines calculation alone is not enough.

### A. Quantity and Role

██ Under the Guidelines, the quantity of drugs is extraordinarily significant. It is, in effect, a proxy for culpability, and in many cases, an inadequate one at that. *See United States v. Lacy,* 99 F.Supp.2d 108, 116 (D.Mass.2000). In this case, for example, drug quantity reflected nothing more than the fortuity of how long the government surveilled the area under investigation and who happened to be there on the nights in question. It does not necessarily reflect the extent to which Garrison—or any of the other defendants in this sweep—relied on drug dealing for his livelihood.[10]

---

9. It should be noted that the crack cocaine guidelines that were promulgated on November 1, 2007, were used to compute this sentence.

10. One defendant could have been be employed, living elsewhere, who occasionally returns to the neighborhood and when he does, sells drugs. Another defendant might be a drug dealer who is at the same corner selling

Garrison was sporadically employed. He had, in the past, relied on his grandmother's financial support. His record disclosed property and motor vehicle crimes, not drug offenses. *See* PSR ¶¶ 47–62 (detailing Garrison's criminal history). Nowhere does Garrison's PSR suggest that he was involved in gang activity or violence. It seems clear that he was a minor player in this 21–defendant sweep.

Just as the Guidelines overemphasized the happenstance of the amount of drugs he was associated with, it under emphasized how minor Garrison's role was. Probation is correct that the Guidelines do not provide for a role adjustment in this case. *See* Guidelines § 3B1.2. This is so because of the structure of the crack distribution at issue here and the paucity of evidence about Garrison's activities.

In many drug conspiracies, especially those involving gangs, there is a strict hierarchy—the source, the packager, the wholesale distributor, the retail distributer. *See, e.g.,* Steven D. Levitt & Sudhir Alladi Venkatesh, *An Economic Analysis of a Drug–Selling Gang's Finances,* 115 Q.J. Econ. 755 (2000) (describing allocation of organizational responsibilities, risk, and financial reward, and noting that street-level dealers face greater risk for diminished gain). All that can be said with confidence about Garrison is that he was a street-level dealer. *See* PSR ¶¶ 13–28 (describing the three separate sales). The undercover officer called him directly to arrange the purchases. *Id.* ¶ 19, 24, 26. There is no evidence that Garrison was the source of the cocaine, that he cooked it and

packaged it for resale, or that he organized the sale in any way. Indeed, there is no evidence that he was connected with the other defendants picked up in the same sweep. If there was a chain—as seems likely—Garrison was at or near the bottom of it. But one of the effects of the government's charging Garrison separately, and providing little information beyond the facts necessary to support the crime, is to obscure Garrison's very minor role in any larger distribution ring and make it difficult for the Court to take it into account. *See* Guidelines § 3B1.2 cmt. nn. 2–3 (restricting role adjustments to offenses involving more than one participant).

## B. *The Prosecution's Choice of Law and Forum*

Defense counsel argued that another fortuity determined this sentence. If Garrison had been charged in state court, he would have been under Mass. Gen. Laws ch. 94C, § 32A(c), subjecting him to a prison term between one and ten years. Moreover, defense counsel represented that as a low-level street dealer of crack, Garrison would have been prosecuted in Massachusetts District Court, rather than Superior Court—especially if he had been arrested after the first transaction. If so, he would have been subject to at most a two-and-a-half year maximum term,[11] and possibly probation.

Of the 21 defendants arrested in the raid, only twelve were charged in federal court. *See* Globe Article ¶¶ 9–10 (listing eleven individuals in addition to Garrison); *id.* ¶ 5 (noting that the remaining defen-

---

drugs night after night. A system that focused only on drug quantity—not a broader investigation of who was doing what, what was going on in their lives—would treat these individuals as similar, when they are not.

**11.** Massachusetts General Laws ch. 94C, § 32A(a) provides that a violator "shall be punished by imprisonment in the state prison

for not more than ten years, or in a jail or house of correction for not more than two and one-half years." However, a district court does not have the jurisdiction to sentence offenders to the state prison. *Id.* ch. 218, § 27. Therefore, Garrison's sentence would effectively have been capped at 30 months.

dants were charged in state court). But because there is no information regarding the defendants who were charged in state court, rather than federal court, there is no meaningful way of evaluating counsel's claim that Garrison properly belonged to the other group. All that is clear is that the punishment Garrison faces in federal court is substantially more than he would have faced but for the choice of a federal forum.

## C. *The Crack/Powder Disparity*

If Garrison had been distributing cocaine in its powder form, his base offense level would have been halved—12 rather than 24. *Compare* Guidelines § 2D1.1 (c)(8) *with id.* § 2D1.1(c)(14). Factoring in acceptance of responsibility per § 3E1.1(a) and assuming criminal history category VI, Garrison's Guideline range would have been 24–30 months—less than a third as long as his actual Guideline range of 77–96 months. At the sentencing hearing, the government took the position that the distribution of crack cocaine does deserve a punishment more severe than that of powder cocaine because of the impact crack distribution has had on the communities in which the offense took place. While the position is surely arguable, it hardly justifies the extent of the Guidelines' disparity between crack and powder, a disparity wholly without empirical support. *See Kimbrough*, 128 S.Ct. at 566–67. Nor does the government's position account for the other consequences of harsh crack sentences, such as the impact of lengthy imprisonment on these same communities. *See, e.g.*, Todd R. Clear, *The Problem With "Addition by Subtraction": The Prison–Crime Relationship in Low–Income Communities*, in *Invisible Punishment: The Collateral Consequences of Mass Imprisonment* 181 (Marc Mauer & Meda Chesney–Lind eds., 2002); Todd R. Clear, *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse* (2007).

## D. *Criminal History*

Long before *United States v. Booker*, the Sentencing Commission, recognizing the inadequacies of the criminal history scoring system, encouraged departures where "reliable information" indicated that the criminal history category "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." Guidelines § 4A1.3(b)(1). *See United States v. Woodley*, 344 F.Supp.2d 274, 277 (D.Mass.2004). Indeed, the Guidelines' scoring makes no distinction between violent and non violent offenses: an addict with a record of drug convictions could have a higher score than another defendant with a murder conviction. *See, e.g., United States v. Ennis*, 468 F.Supp.2d 228, 232 (D.Mass.2006) (noting defendant had a criminal history category II "notwithstanding the fact that he had a murder conviction for which he had received the death penalty, later reduced to a sentence of life imprisonment from which he was paroled"); *United States v. Leviner*, 31 F.Supp.2d 23, 33 (D.Mass.1998) ("To treat this man [Leviner] as if he were only a point on a grid ... would do violence to the purposes of the Sentencing Guidelines. It would treat someone convicted of Felon in Possession of a Firearm [the defendant's conviction] with a minor record, solely because he had a few sentences in the criminal history (1), (2), and (3) range, the same as someone with multiple, violent crimes, and multiple ten to fifteen year sentences. It would create a new form of disparity, treating offenders that are completely different in a like way.").

Garrison has a lengthy criminal history, but has never before been convicted of a drug crime or a crime of violence. Most of Garrison's criminal history points stack up for larceny-type and motor-vehicle offenses: receiving stolen property, shoplifting, driving while his license was suspended. Garrison's "score" increased because these offenses occurred while he was on probation for previous offenses.[12] He has been imprisoned before, but he apparently received little or no drug treatment.

Garrison's record is troubling, to be sure. But it is not the equivalent of a category VI, the category we reserve for the most serious, often the most violent, offenders. I will treat this as a category III.

### E. Other Defendants Arrested in the Same Sweep

Of the eleven other defendants to be indicted in federal court as a result of the ATF sting, six had already been sentenced by the time I imposed Garrison's sentence. Of those six, three received downward departures. One was sentenced under the career offender guidelines, Guidelines § 4B1.1; I do not consider him to be comparable to Garrison. The other five, however, are roughly comparable.

*Jean Janvier,* 07cr10005: Janvier was indicted for two crack transactions totaling between 2 and 3 grams of crack, yielding a total offense level of 17 under the then-applicable Guidelines. His transactions were thus slightly smaller than Garrison's, and one fewer, but he is clearly in the same ballpark. Moreover, Janvier's criminal history category is III, the same as my reading of Garrison's criminal history.

In sentencing Janvier, the Court departed downward from the Guideline range of 30–37 months, imposing a sentence of 24 months. The Court reasoned that "a guideline sentence would be six months longer than necessary" due to Janvier's lesser culpability compared to his co-defendants, his relative youth, and the possibility for rehabilitation in a structured environment following his release from prison. *See* Judgment in a Criminal Case, *United States v. Smoak,* No. 07CR10005–NMG (D.Mass. Aug. 3, 2007) (document # 61).

Subsequently, when the Sentencing Commission made the 2007 Guidelines retroactively applicable to crack cocaine offenses, see Suppl. 2007 Guidelines Manual § 1B1.10, Janvier's sentence was reduced to 19 months. *See* Order Regarding Mot. Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2), *United States v. Smoak,* No.

---

12. Garrison was found guilty on April 20, 2005, of operating a motor vehicle with a suspended license. He was sentenced to 60 days' imprisonment, with the term suspended until April 19, 2006. By that date, he was to either perform 108 hours of community service or pay a $1,000 fine. PSR ¶ 54. During that time, however, he was arrested on a charge of receiving stolen property, *id.* ¶ 55, and on June 15, 2006, he was ordered to serve his 60–day sentence. He received two criminal history points for the underlying offense. Because the instant crack offense occurred less than two years after being released from the 60–day sentence for driving without a license, he also received an additional point. *Id.* ¶ 60.

Later, Garrison was convicted of negligently operating a motor vehicle in October 2006. He was given a 6–month suspended sentence, probation for one year; probation terminated following his arrest for this offense. *See id.* ¶ 57. The offense was worth one point. But the imposition of the probation term meant that Garrison was under a criminal justice sentence when he committed the crack offense, resulting in two additional points. *Id.* ¶ 59.

On another occasion, he fled the police on his bike to avoid an outstanding warrant on the motor vehicle charge. He ran into a basement to avoid the police, and was arrested for breaking and entering—two more points. *Id.* ¶ 52.

07CR10005–NMG (D.Mass. Apr. 3, 2008) (document # 107).

**Anthony Johnson, 07cr10003:** Johnson was also charged with two transactions, totaling 1.6 grams—a total offense level of 15. Johnson did have a criminal record, placing him in criminal history category IV. Although the sentencing took place approximately a month before the 2007 guidelines went into effect, which slightly lowered the total offense level for crack cases, the Court elected to apply them to Johnson. Doing so lowered his total offenses level to 13. Treating 13 as the actual offense level, the Court imposed a "Guideline" sentence—it would have been but for the fact the Guidelines had not yet come into effect—of 24 months. As a reason not to lower Johnson's sentence still further, the Court noted his substantial criminal record. *See* Judgment in a Criminal Case, *United States v. Johnson*, No. 07CR10003–RCL (D.Mass. Oct.5, 2007) (document # 21).

**Nicholas Otey, 07cr10004:** Like Garrison, Otey was charged with three separate transactions; the total weight was 5 grams, meaning he too had a total offense level of 21. Def.'s Sentencing Mem. at 2, *United States v. Otey*, No. 07CR10004–EFH (D.Mass. filed Feb. 27, 2008) (document # 14). And like Garrison (again, taking the above adjustment into account), Otey was in criminal history category III. Noting Otey's youth, his "difficult family situation," and the relatively small amount of crack at issue, the Court imposed a sentence of 30 months. See Judgment in a Criminal Case, *United States v. Otey*, No. 07CR10004–EFH (D.Mass. Mar. 5, 2008) (document # 21).

**Gerald Scott, 07cr10005:** Scott was only charged based on a single sale of slightly less than one-half gram of crack, a total offense of 14 under the then-applicable Guidelines. Scott also had a criminal history category of IV, but the Court found that the record understated his culpability and varied upward to criminal history category V. It imposed a guideline sentence of 30 months.

As with Janvier, Scott's sentence was subsequently reduced to take account of the new crack guidelines, reducing his sentence to 24 months. Order Regarding Mot. Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2), *United States v. Smoak*, No. 07CR10005–NMG (D.Mass. Mar. 18, 2008) (document # 103).

**Gary Wallace, 07cr10068:** In four transactions, Wallace sold a total of 6.19 grams of crack to an undercover police officer. Under the older crack guidelines, this yielded a total offense level of 23, but as for Johnson, the Court prospectively took into account the impending changes to the crack guidelines, effectively reducing his total offense level to 21. Unlike Garrison, Wallace had no substantial criminal record, placing him in criminal history category I. Again like Johnson, the Court imposed a "Guideline" sentence, departing only on the ground of the upcoming Guideline changes: 42 months' imprisonment. *See* Tr. Sentencing Hearing, Ex. to Judgment in a Criminal Case, *United States v. Wallace*, No. 07CR10068–WGY (Oct. 4, 2007) (document # 20).

■ After reviewing these sentences,[13] I conclude that a sentence of 30 months is appropriate. Like Scott, Garrison is some-

---

**13.** Furthermore, although he had not yet been sentenced when the Court imposed Garrison's sentence, Melvin Green's sentence is consistent with the Court's observations. Green sold a total of six grams of crack in seven transactions, placing him in total offense level 21; he also had a criminal history category of

I. The Court departed downward, emphasizing Green's youth and insubstantial criminal history. It found that 24 months was sufficient, but no greater than necessary, to serve the purposes of sentencing. *See* Tr. Sentencing Hearing, Ex. to Judgment in a Criminal

what older than Otey, Green, and Janvier. Like Johnson, his criminal history is substantial enough to be accorded some weight, but given how drastically it overstates his culpability, it is not particularly like Scott's. The 30–month sentence is longer than the median sentence for this group of defendants, 24 months, or the average, 27 months,[14] appropriately reflecting the quantity of drugs Garrison sold and his criminal history compared to the similarly situated defendants. It properly places Garrison in a group with Otey and Scott, rather than the other defendants.

The 30–month sentence thus properly reflects Garrison's culpability, and I find it sufficient but no greater than necessary to reflect the principles of sentencing enumerated in 18 U.S.C. § 3553(a). But at the same time, in the hopes of fashioning a sentence that will finally enable Garrison to get drug treatment and vocational train-ing, I will attach specific conditions to supervised release.

### III. *CONCLUSION*

For the reasons stated above, I find the appropriate total offense level to be 21, with an adjusted criminal history category of III, giving an adjusted Guideline range of 46–57 months. I will depart to 30 months. This amount is appropriate because it is more time than Garrison has ever done before and compares with similarly situated offenders here. Coupled with drug treatment on three years' supervised release and a requirement that he stay outside the neighborhood, this sentence offers some hope of breaking the patterns into which this 27–year–old man has fallen. Given the amount of time Garrison has already served, I would assume he is or will shortly be able to be transferred to community corrections.

**SO ORDERED.**

---

Case, *United States v. Green*, No. 07CR10002–GAO (Oct. 4, 2007) (document # 20).

**14.** These figures include Green's sentence and the adjustments to Janvier's and Scott's sen-tences, all of which occurred after the date of Garrison's sentencing but before the judgment entered in this case.

**EXHIBIT A**
**United States v.William Garrison**
**Sentencing Memorandum - Dated May 20, 2008**
**Crim. No. 07cr10142-NG**

The following data is taken from docket sheets, judgments, plea agreements, and, where available, sentencing memoranda. The information is current as of March 9, 2008, the date of Garrison's sentencing.

| Defendant (age) and docket no. | Transaction and quantity | Offense level | Criminal history | Disposition or Guideline Range |
|---|---|---|---|---|
| Bryant, Chris (age 35). 07-10067-NMG. | One transaction, 0.74 g | 29 (career offender) | VI | Sentenced to 90 months (downward departure) |
| Green, Melvin (age 19). 07-10002-GAO. | Seven transactions, about 6 g | 21 (disputed) | I | Set for 3/11/08. GLR: 37-46; lower if safety-valve proffer is made. |
| Janvier, Jean (age 21). 07-10005-NMG. | Two transactions, 2-3 g | 17 | III | Sentenced to 24 months (downward departure based on lesser culpability and individual defendant) |

| Defendant (age) and docket no. | Transaction and quantity | Offense level | Criminal history | Disposition or Guideline Range |
|---|---|---|---|---|
| Johnson, Anthony (age 24). 07-10003-RCL. | Two transactions, about 1.6 g | 13 (with crack adjustment) | IV | Sentenced to 24 months (guideline range with crack adjustment) |
| Otey, Nicholas (age 19). 07-10004-EFH. | Three transactions, quantity unknown | Unknown | III (subsequent firearm case pending) | Harrington: 30 months (downward departure; notes age, difficult family situation, small amount of crack. Memorandum forthcoming.) |
| Phillips, Fernando (age unknown). 07-10005-NMG. | One transaction, 1.8 g | 34 | VI (career offender) | Trial scheduled 3/24 |

| Defendant (age) and docket no. | Transaction and quantity | Offense level | Criminal history | Disposition or Guideline Range |
|---|---|---|---|---|
| Scott, Gerald (age 36). 07-10005-NMG. | One transaction, 0.49 g | 12 | IV (upward adjustment to V) | Sentenced to 30 months (guideline range with upward CHC adjustment); pending motion to reduce based on retroactive crack guidelines |
| Smoak, Kelly (age 34). 07-10005-NMG. | Multiple transactions, quantity unknown | 34 | VI | Trial scheduled 3/24 |
| Walker, Kelly (age 24). 07-10006-RCL. | One transaction, quantity unknown | 34 | VI | Trial scheduled 6/2 |
| Wallace, Gary (age 19). 07-10068-WGY. | Four transactions, totaling about 6 g | 23 (21 with crack adjustment) | II | Young: sentenced to 42 months (downward variance based on crack adjustment) |

| Defendant (age) and docket no. | Transaction and quantity | Offense level | Criminal history | Disposition or Guideline Range |
|---|---|---|---|---|
| Webbe, John (29). 07-10007-RGS. | One transaction, quantity unknown | Unknown | VI | Set for 5/7/08 |