UNITED STATES of America,

v.

**Myles HAYNES, Defendant.**

**Crim. No. 06CR10328–NG.**

United States District Court,
D. Massachusetts.

June 3, 2008.

---

Jessica Diane Hedges, Stephen B. Hrones, Michael L. Tumposky, Hrones, Garrity & Hedges, Boston, MA, for Defendant.

John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, for Plaintiff.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

On July 9, 2007, Myles Haynes ("Haynes") pled guilty to two counts of an indictment charging him with distribution of cocaine base in a public housing project, as well as aiding and abetting the distribution of cocaine base, all in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 860(a), and 18 U.S.C. § 2. The indictment also named two others, Kenneth Whigham and Gerrod Brown.[1]

Haynes, Whigham, and Brown were only three of the defendants caught up in an eighteen-defendant sweep that represented the culmination of "Operation Brick

---

1. Brown pled guilty on June 4, 2007, and received a sentence of imprisonment of 12 months plus one day. The disposition in Whigham's case is still pending.

House," an investigation conducted jointly by the Federal Bureau of Investigation ("FBI") and the Boston Police Department ("BPD") into the Bromley–Heath Housing Development in Jamaica Plain, Massachusetts. *See* Sieland Aff. ¶¶ 1–2, 14 (document # 5–1). The investigation focused on drug trafficking and other suspected criminal behavior in the housing project, including ongoing gang activity and violence. A review of the results of the investigation make clear that Haynes was among the least culpable. Indeed, in an investigation that spanned months, law enforcement came upon Haynes on only two occasions: May 11, 2006, and May 16, 2006. They did not know who he was prior to these two encounters. His name had never come up before and they did not know what he did for a living; whether he was employed; or even whether he had a criminal record.

In fact, Haynes had an extensive employment history, culminating most recently in his successful training to be an Emergency Medical Technician ("EMT") shortly before this arrest. A review of Haynes' personal history reveals that he made repeated efforts to get out of the Bromley–Heath Housing Development and the life it seemed to forecast. He attended Newton North High School, a suburban high school, through the Metco program.[2] He entered the United States Marine Corps for a time, and then community college, but had to leave to support his family when his first child was born.

But this trajectory—focused on work and family—was disrupted in 1998 when Haynes was charged with and convicted of crimes arising out of an incident at a New Year's Eve party. He did a short sentence and set out to start again, working wherever he could, and, finally, successfully completing an EMT course. The problem—and it was a considerable one—was Haynes' felony conviction, which followed him like a shadow and now stood in the way of his becoming a licensed EMT. This was the context surrounding his participation in the conduct charged in the indictment. Nevertheless, despite his arrest, Haynes' EMT training served him well when he used it to save the life of another inmate while in pretrial detention on these very charges. *See* Exh. E to Def.'s Sentencing Mem. 3 (document # 77–6).

At the time of sentencing, Haynes had already served approximately thirteen months in pretrial detention, longer than the sentence he served for the 1998 conviction. The recommended sentence under the United States Sentencing Guidelines Manual, 33–41 months, was driven exclusively by the quantity of drugs for which he was responsible (on those two occasions in May 2006), the location of the sales, and his criminal history (Criminal History Category II). The government argued that the lower end of the Guidelines, 33 months, was entirely appropriate, not just because the Guidelines recommended it, but because "public safety," one of the factors in 18 U.S.C. § 3553(a), demanded it.

I found otherwise. While public safety certainly calls for the incapacitation of some, there is another side to the equation, which, after *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), may finally be given the serious consideration it deserves. The facts pre-

---

**2.** The Metco program is a state-funded grant program that allows students in the Boston Public Schools to attend schools in selected Boston suburbs. "The Metco program was started in the 1960s to provide enhanced educational opportunities for participating students, to reduce the racial isolation of suburban school districts, and to reduce segregation in city schools." Metco Program Website, http://www.doe.mass.edu/metco.

sented by Haynes' case force the Court to confront the inescapable fact that disadvantaged communities like Bromley–Heath are injured *both* by crime *and* by the subsequent mass incarceration of their young men. *See* Donald Braman, *Criminal Law and the Pursuit of Equality*, 84 Tex. L. Rev. 2097, 2114–17 (2006). *Compare* Randall Kennedy, *Race, Crime, and the Law* 373–76 (1997), *with* Todd R. Clear, *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse* (2007). Courts may no longer ignore the possibility that the mass incarceration of nonviolent drug offenders has disrupted families and communities and undermined their ability to self-regulate, without necessarily deterring the next generation of young men from committing the same crimes.

Haynes is an individual for whom continued incarceration beyond thirteen months makes no sense. Indeed, here, public safety seems to require the opposite of the government's request; it requires that Haynes be permitted to return to his children so that they do not repeat his errors. Thus, I sentenced Haynes to time served: the thirteen months he had already served in pretrial detention plus a carefully considered supervised release program.

## I. BACKGROUND

Myles Haynes' life seemed to be all about improving his life for himself and his children. He graduated from Newton North High School through the Metco program. He entered the United States Marine Corps, only to have his military career cut short two weeks before completing basic training by an injury to his heel. Between 1990 and 1995, Haynes lived with an uncle in Ohio. There, he enrolled in Owens Community College, but had to leave school to work full time when his first child, a daughter, was born. Haynes' move back to Massachusetts in 1995 coincided with the end of his relationship with his daughter's mother. Despite the move, however, he continued to bring his daughter to Massachusetts to spend summers with him.[3]

In 1996, he began a new relationship with a woman in Boston with whom he had a son (now eight years old). During the relationship, Haynes also became very close to the woman's two older children from a previous relationship—now ages thirteen and sixteen—who call Haynes "Dad." Though Haynes and the woman broke up in 2002, they continue to have a good relationship and Haynes remains close to all of his children.[4]

In 1998, when he was in his late twenties, his plans began to unravel. After an incident at a New Year's Eve party, Haynes was charged with armed assault with intent to kill and related offenses. He was convicted after a jury trial, but, despite the seriousness of the charges against him, was sentenced to serve only one year and one day in jail with five years of probation.[5] The probation officer who

---

3. He has also provided support of between $110 and $130 a week.

4. Haynes' son attended his sentencing hearing. Apparently at Haynes' direction, at certain points in the proceeding, when the underlying facts of the case were discussed, Haynes' son was taken out of the courtroom so he would not hear what was related about his father.

5. Haynes was ultimately convicted of armed assault with intent to kill and possession of a gun. At the sentencing hearing, defense counsel represented to the Court, without objection from the government, that the incident had taken place at a New Year's Eve party and had been very chaotic; the jury compromised and the judge, reflecting the mitigating factors presented, sentenced Haynes to a relatively short sentence of one year and one day.

supervised him after his release has indicated that Haynes did very well on probation, finding employment and becoming actively involved with his then-girlfriend and his burgeoning family.[6]

Reconstructing his life was not easy after 1998. After his relationship with his son's mother ended in 2002, Haynes spent two years alternately living between his brother's and his cousin's apartments in the Bromley–Heath development. Starting in 2004, he also lived for a time in Dorchester, Massachusetts, with another woman with whom he had a relationship. During this time he made numerous attempts to find employment, and he worked for periods as a maintenance worker at a hospital and then at Bromley–Heath, as an assistant manager in a retail store, and as a bouncer at a bar.

Nonetheless, from December 2004 to the time of his arrest in October 2006, Haynes was, for the most part, unemployed. He persisted in his attempt to find employment through 2006, applying for several jobs, but was rejected each time because of his criminal record.[7] *See* Exhs. A, B, & C to Def.'s Sentencing Mem. (documents ## 77–2 through 77–4).

Then, in 2006, Haynes' prospects substantially improved when he successfully completed the Boston Emergency Medical Services Emergency Medical Technician course. Boston Emergency Services reported that Haynes' "scholastic standing, attendance, behavior, cooperativeness, leadership, reliability, courtesy, and ability to get along with other students was good." Pre-sentence Report ¶ 97. However, despite his success in the program and to his disappointment, Haynes was unable to become a licensed EMT because of his 1998 felony conviction and told that he would be required to meet with a psychiatrist to determine if he was a danger to the community. According to Haynes, had he met all of the requirements, the psychiatrist could pronounce that he would not be a danger to the public, and thereby allow him to receive his EMT license. Unfortunately, he was unable to complete the necessary sessions due to his arrest in the instant matter.

By 2006, Haynes was apparently desperate. That desperation led him to sell the drugs that form the basis of the charges to which he pled guilty before this Court. By all indications, drug dealing was an aberration in Haynes' life: it was not where he was heading, not what he expected to be doing, and not what he even wanted to do. It was a reckless choice. Nothing in the police or FBI reports of this case suggest that Haynes was anything more than an incidental player in the conduct targeted in the Bromley–Heath sweep.

Indeed, despite his arrest and detention in connection with this case, Haynes was able to put his EMT training to work on April 16, 2007, coming to the aid of a fellow inmate who was having a diabetic seizure. Haynes notified Plymouth County Correctional Facility's staff of the emergency, and by the time prison staff and members of the medical staff responded, he had already started to assist the other inmate, opening a few glucose packs that were present in the cell and administered them. According to the report generated by Plymouth staff, Haynes acted quickly on

---

**6.** Haynes' probation officer expressed genuine surprise upon hearing of the charges in the instant case.

**7.** Exhibit C to Haynes' Sentencing Memorandum is a letter from Carol L. Thomas, recruiter for the Massachusetts Bay Commuter Railroad Co., rescinding an offer of employment, indicating that "[t]he decision was influenced in whole or in part by a report obtained through the Massachusetts Criminal History Systems Board." *Id.* (document # 77–4).

his own to help stabilize the inmate's blood sugar levels. Exh. E to Def.'s Sentencing Mem. 3 (document # 77–6). The medical staff later "told inmate Haynes that he did a great job by giving [the inmate] the initial glucose feeding." *Id.*

## II. *ADVISORY GUIDELINE RANGE*

■ Haynes' base offense level pursuant to § 2D1.2(a)1 of the November 2007 Sentencing Guidelines is 22.[8] Because of his timely acceptance of responsibility he is entitled to a three point adjustment under § 3E1.1(a)-(b). Thus, his Guideline total offense level is 19. His Criminal History Category, deriving exclusively from the one incident in 1998, is II. The resulting advisory range is 33–41 months incarceration.

But the Guideline analysis does not begin to capture the issues that should drive this sentence. The Guideline range of 33–41 months is driven, as is usual, by the quantity of drugs. *See United States v. Garrison*, 560 F.Supp.2d 83, 86–87, 2008 WL 2121784, at *3–4 (D.Mass.2008); *United ed States v. Ennis*, 468 F.Supp.2d 228, 238 (D.Mass.2006). The Sentencing Commission, for its part, has never explained exactly how drug quantity is meant to measure offense seriousness, and, significantly, how it correlates with the purposes of sentencing under 18 U.S.C. § 3553(a).[9]

The only explanation implicit in the Guideline framework itself is that drug quantity is somehow a proxy for culpability. However, in some situations, like the case at bar, it provides an unsatisfying and empty stand-in for the concerns underlying our current sentencing regime. Drug quantity measures only what the police

happened to have seen at the time of their surveillance—a snapshot, though not necessarily an accurate one, of what is going on in the defendant's life. *See Garrison*, 560 F.Supp.2d at 86–87, 2008 WL 2121784, at *3–4; *Ennis*, 468 F.Supp.2d at 230; *United States v. Maisonet*, 493 F.Supp.2d 255, 258 (D.P.R.2007).

And while drug quantity is overvalued under the Guidelines, the defendant's minor role in the criminal activity is undervalued. This is especially true in crack distribution cases, for reasons I described in *Garrison*, 560 F.Supp.2d at 87, 2008 WL 2121784, at *4. *See also* U.S.S.G. § 3B1.2. There, I explained:

> In many drug conspiracies, especially those involving gangs, there is a strict hierarchy—the source, the packager, the wholesale distributor, the retail distributer. *See, e.g.*, Steven D. Levitt & Sudhir Alladi Venkatesh, *An Economic Analysis of a Drug–Selling Gang's Finances*, 115 Q.J. Econ. 755 (2000) (describing allocation of organizational responsibilities, risk and financial reward, and noting that street-level dealers face greater risk for diminished gain).

*Garrison*, 560 F.Supp.2d at 87, 2008 WL 2121784, at *4. Where the defendant falls in this type of hierarchy is an important factor in this Court's assessment of the defendant's ultimate culpability.

Here, a downward adjustment based on Haynes' role seems even more appropriate than it was in *Garrison*. But for the deals charged in the indictment, it is not even clear that Haynes was much of a street-level dealer. He had pursued a meaningful life, possessed a meaningful work history, and had made real strides toward ac-

---

**8.** This includes a two-level increase for sales taking place within 1,000 of a public housing project. *See* U.S.S.G. § 2D1.2(a)(1).

**9.** *See* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am. Crim. L. Rev. 19, 71–72 (2003).

quiring a profession and doing good in the world. He was plainly a "very small fish" in the context of the Bromley–Heath sweep. Most of the individuals involved in the sweep were indicted for sales of over five grams or somehow implicated in gang activity.[10] Even Haynes' co-defendants in this case played more significant roles in drug trafficking. Whigham was alleged to have been involved in multiple controlled buys. Pre-sentence Report ¶ 6–35. Brown was alleged to have been associated with gang activity. See Sieland Aff. At ¶ 13 (document # 5–1).

There are no such indications that Haynes was in any way implicated in gang activity, nor is there any allegation that he possessed, talked about, or had even been in the vicinity of firearms. The information before the Court indicates that Haynes made two very small sales in the spring of 2006.[11] And, in determining whether he is "less culpable than other participants," see U.S.S.G. § 3B1.2, Haynes' life and background should be relevant. During 2006, most of his attention was focused on vocational training as an EMT, his search for employment, and his family. Under these circumstances, I conclude that Haynes should receive a downward adjustment of two levels to a total offense level of 17, pursuant to U.S.S.G. § 3B1.2(b), resulting in a recommended range of 27–33 months. But even that adjustment does not do justice to the case at bar.

## III. THE § 3553(a) FACTORS

18 U.S.C. § 3553(a) directs me to consider the need for the sentence imposed in the light of the seriousness of Haynes' offense and the need to provide just punishment; the community's interest in public safety; deterrence, both specific and general; and likely recidivism.

█ The government argued intently that deterrence and the community's interest in public safety required a sentence at the low end of the Guideline range. The government directed the Court's attention to the impact that Haynes' crimes and crack cocaine traffic has had on the Bromley–Heath community. Recently, Bromley–Heath was identified as one of Boston's five "hotspots," defined as areas that, in 2006, collectively accounted for 25% of the city's fatal shootings and 40% of the city's non-fatal shootings through July 13, 2006. See Sieland Aff. ¶ 9 (document # 5–1). While the government acknowledges that Haynes played only a small part in this, it nonetheless calls for his incarceration because of the environment "he helped foster by trafficking." Gov't Sentencing Mem. 7 (document # 76). The sentence it urges the Court to impose reflects its view of the need for both specific and general deterrence.

---

10. See Sieland Aff. ¶ 13 (document # 5–1); id. at ¶ 1 n.1 (citing United States v. Carrasquillo et al., Cr. No. 06–10320–WGY; United States v. Bush, Cr. No. 06–10319–JLT; United States v. Jones et al., Cr. No. 06–10326–RCL; United States v. Loving, 06–101316–RWZ; United States v. Gibbons, Criminal No. 06–10326–NMG).

11. Haynes pled guilty to sales amounting to 3–4 grams of crack cocaine. Eric Sterling, former counsel to the U.S. House Committee on the Judiciary, 1979–1989, who participat-

ed in the passage of the mandatory minimum sentencing laws, has observed that, "5 grams [of crack] is the weight of the tiny amount of powder in 5 packets of 'Sweet and Low' artificial sweetener." Eric E. Sterling, Getting Justice Off Its Junk Food Diet (2006), http://cjpf.org/Getting_Justice_Off_Its_Junk_Food_Diet.pdf. Thus, by way of analogy, under the Guidelines, Haynes' sentence would be driven by a drug quantity roughly equal to the amount of powder in 3–4 packets of "Sweet and Low."

It is clear that punishment plays an important role in deterring crime, but the nature of that relationship is not so clear cut. There is a significant downside to what has been called the American experiment in mass incarceration. Large numbers of people reenter communities that have little or no ability to absorb them, resulting in a constant shuffling and re-shuffling of neighborhood residents. And while prisoners are obviously not committing crime in their communities while they are incarcerated, they also are not functioning as parents, workers, consumers, or neighbors.[12] The deterrence message itself may be equivocal: "The effect on these communities is compounded by the fact that imprisonment has become an almost inevitable aspect of the experience of growing up as a black male in the U.S." Marc Mauer, *Lessons of the "Get Tough" Movement in the United States* 6 (2004).

The sentencing literature has only recently begun to address whether or not mass incarceration works; what the impact on communities is when large numbers of young men of a certain age are imprisoned; and what the impact is on families and on children. *See, e.g.,* Travis, *supra* note 12. However, there is growing evidence that the coerced removal of residents from poor and disadvantaged neighborhoods—even of those thought to be involved in criminal activity—may, in some cases, undermine a community's ability to self-regulate and exercise informal social control over crime by further disrupting the creation of social and familial bonds. *See* Todd R. Clear, *The Problem With "Addition by Subtraction": The Prison–Crime Relationship in Low–Income Communities, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment* 181 (Marc Mauer &

Meda Chesney–Lind eds., 2002); Todd R. Clear, *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse* (2007). To be sure, these concerns should not lead to wholesale leniency, no matter the facts. Rather, they suggest that courts should tread extremely cautiously when deciding whether and how long to incarcerate non-violent drug offenders.

With this in mind, it is not at all clear that public safety demands that Haynes— a father who has shown real motivation to live a fruitful and productive life and who has meaningful relationships with all of his children, including and particularly his eight-year-old son—should be further separated from his family and support network. In the Court's judgment, Haynes' life history, his relationship with his family, and his clear motivation to better himself serve as far better proxies for making predictions based on public safety than the quantity of drugs he sold on two occasions in May 2006. Further dislocation, which jail necessarily implies, would undoubtedly weaken the ties that will enable him to move on with his life as a citizen and as a parent.

The thirteen months Haynes spent in jail prior to his sentencing are not an insignificant punishment. In light of his life history and the minor role he played in the conduct targeted in Operation Brick House, thirteen months represents an adequate and sufficient sentence to accomplish the aims of 18 U.S.C. § 3553(a). Accordingly, I sentenced Haynes to time served—thirteen months—with supervised release for six years. In addition to the standard conditions of supervised release, Haynes will participate in the Moving Ahead Program or any other program designed to address his very real problem of

---

**12.** As one scholar reports, in 2004 there were approximately 1.5 million children in the U.S.

who had a parent in prison. Jeremy Travis, *But They All Come Back* 119 (2005).

finding meaningful employment, and he will be prohibited from returning to the Bromley–Heath Housing Development without the prior permission of the Probation department.

**SO ORDERED.**