**UNITED STATES of America,**

v.

**Kenneth WHIGHAM, Defendant.**

**Criminal No. 06cr10328–NG.**

United States District Court,
D. Massachusetts.

˙Dec. 3, 2010.

John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, for Plaintiff.

## SECOND AMENDED[1] SENTENCING MEMORANDUM

NANCY GERTNER, District Judge.

This case arose out of a joint federal-state arrest of twenty-three individuals who distributed crack cocaine in the Bromley Heath housing project in Boston, Massachusetts. While there is no question that crack cocaine has been the scourge of this neighborhood, like many others in Boston, my focus here must be on the sentence of one man, Kenneth Whigham ("Whigham").

Whigham was charged with participating in drug deals on three dates, March 31, 2006, May 11, 2006, and May 12, 2006,

distributing a total of 4.75 grams of crack cocaine. In addition, the government claims that Whigham participated in other drug deals which, though uncharged, comprise relevant conduct under the United States Sentencing Guidelines. All told the amount attributed to Whigham's dealing was 10.25 grams. But whatever the totals, no one doubts that Whigham was, at best, a street dealer, as were virtually all of the individuals caught up in the sweep. He is also 46, with substantial mental deficits, living with his mother all of his life, with no visible means of support.

Four individuals were sentenced before me: Kenneth Whigham, Gerrod Brown, Louis Ortiz and Myles Haynes, each indicted not just for distributing the drug, but for doing so within 1,000 feet of a public housing project. See generally United States v. Haynes, 557 F.Supp.2d 200 (D.Mass.2008). Apart from these three individuals, there were fifteen other cases before other judges of the District of Massachusetts. See infra Table 1. Still others—presumably minors—were charged in state court. To be sure, it is difficult to put cases arising out of a single sweep in context when they are brought before different judges. The government suggests these difficulties are the unavoidable product of entirely legitimate charging decisions. There was, the government claims, no overarching conspiracy here to justify bringing all cases before a single judge. Just so. Each is a street dealer; each is effectively at the bottom of the "crack cocaine" distribution chain.

As in many of these cases, the Sentencing Guidelines called for an extraordinarily severe sentence, 188–235 months. The

---

**1.** This Sentencing Memorandum amends one sentence in the Amended Memorandum of November 30, 2010. The first sentence of the third paragraph on page 20 now reads: "Mr. Whigham's case sits somewhere in between Allen and Ortiz. He has a longer record than Allen, and unlike Ortiz, a record of consistent law breaking, but, in contrast to both, it is a non violent record."

range is driven by certain widely criticized guidelines—the fact that Whigham qualifies as a career offender under U.S.S.G. § 4B1.1, the extent to which the Guidelines emphasize quantity over most other factors, the extraordinary severity of the crack guidelines, as compared with the powder cocaine guidelines, and the extent to which the Guidelines in effect at the time of Whigham's sentencing fail to give sufficient attention to mitigating factors like the defendant's role in the offense or the defendant's profound mental deficiencies. (Recent changes in the Sentencing Guidelines have ameliorated some of these problems, particularly with respect to the crack cocaine guidelines. Whigham, however, was sentenced before any of the changes took effect.)[2]

Significantly, *neither side* recommended a Guideline sentence. The government recommended 114 months; the defendant recommended time served (which amounted to nearly four years). I sentenced Whigham to sixty months and six years of supervised release, with detailed conditions to address his complex problems.

I first describe Whigham's background. In order to perform my responsibilities post *United States v. Booker*, 543 U.S. 220, 245, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), under a now advisory Guidelines regime, I have to understand all the facts about the defendant's life and the circumstances of this offense, not simply the facts made relevant by the Guidelines. I then address the Guideline sentence and why it is inappropriate here.

Once I determine that a Guideline sentence does not apply, I must then decide what sentence is appropriate to meet the statutory sentencing purposes of 18 U.S.C. § 3553(a) as *Booker* directs. *See* 543 U.S. at 224, 125 S.Ct. 738. In this regard, I will use the approach which I used in other drug sweep cases, described in *United States v. Garrison*, 560 F.Supp.2d 83 (D.Mass.2008). In *Garrison*, I evaluated and compared the sentences imposed on men picked up in the *same* sweep, the *same* geographical area, with the *same* charges—including sentences imposed by other judges—to the case of the defendant before me. In effect, *Garrison* makes the sentences of individuals imposed by other judicial officers function as precedent for my sentence, part of a common law of sentencing.[3]

The government criticizes the *Garrison* approach, arguing that it will somehow exacerbate disparity in this jurisdiction and cites to a recent article by Professor Ryan Scott ("Scott"), *Inter–Judge Sentencing Disparity After Booker: A First Look* (Ind. Legal Studies Research, Paper No. 140, 2010) (hereinafter *Inter–Judge Sentencing Disparity After Booker*), which reflected concerns about Massachusetts federal sentencing. As I describe below, Scott's article defines disparity in terms of the extent to which District of Massachusetts judges are following the Sentencing Guidelines. Following the Guidelines, it

**2.** On August 3, 2010, the Fair Sentencing Act ("FSA") of 2010 took effect reducing sentences for crack cocaine, changing the crack cocaine ratio from 100:1 to 18:1. Fair Sentencing Act of 2010, Pub. L. No. 111–220, 124 Stat. 2372 (codified as amended at 21 U.S.C.A. § 841). To implement the directives in the FSA, the Sentencing Commission promulgated emergency amendments lowering the base offense levels for crack cocaine. *See* Supp. U.S. Sentencing Guidelines Manual § 2D.1.1(c) (Nov. 2010).

**3.** The Court made available the names of the individuals who were in the sweep, and the presentence reports (without personal information). The statements of reasons and sentencing memoranda were available on Electronic Case Filing (ECF).

suggests, promotes the kind of sentencing consistency that the Sentencing Reform Act aimed for.

I disagree with the premise, as I describe below. Similarly situated with respect to the Guideline categories does not necessarily mean similarly situated with respect to the defendant's actual role in the criminal endeavor or his real culpability. Guideline categories (like career offender guidelines) are frequently over broad, giving the same "score" to individuals who are not remotely similar and ignoring critical differences between them (their role in the offense, their mens rea) that should bear on punishment. In any event, in this case, the government's position touting the Scott article was ironic. It *agreed* that the Guideline sentence is far too high for Whigham.

To the extent that Scott's findings suggest differences in the approach to the Guidelines among the judges in Massachusetts, they should be carefully evaluated, which I do below. The critical question is what these disparities reflect—whether they reflect the untutored preferences of particular judges, as often occurred pre-Guidelines, or real jurisprudential differences involving Guidelines that are problematic. In my judgment, they reflect the latter; the good faith, reasoned evaluations of Guidelines and facts. Even before

*Booker,* the Guidelines contemplated that district court judges would depart from the Guidelines on occasion, that the Commission would consider these departures and amend the Guidelines, if appropriate, allowing for a collaborative evolution of Guideline law.[4] After *Booker,* more of the work of that evolution is to be done by the appeals courts than the Commission—determining which approaches are "reasonable" and which are not.

In the short term, until there is precedent in the areas in which there are real issues, like the career offender and crack cocaine Guidelines, differences in approach across cases are unavoidable. That is all the more reason for using the *Garrison* approach, at the very least, looking carefully at the sentences given to individuals in a given sweep, in the same geographic area, in roughly the same time period, having the same role in the offense.

Let me be clear—in answer both to Professor Scott and the critics of advisory Guidelines: When I choose not to follow the Guidelines, it is not because I simply disagree with them and seek to substitute my own philosophy of sentencing. It is because the Guideline at issue is wholly inconsistent to the purposes of sentencing under 18 U.S.C. § 3553(a). And when I assign a non-Guidelines sentence, I am

---

**4.** The Commission noted the "difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." U.S. Sentencing Guidelines Manual § 1A1.1 introductory cmt. 4(b) (2003). *See also* Edward M. Kennedy, *Sentencing Reform—An Evolutionary Process,* 3 Fed. Sent'g Rep. 271, 271 (1991) (stressing that the "structure of the guidelines system draws upon the expertise of the judiciary in addressing [key] issues" in sentencing law and that statement and review of reasons for departures were "the cornerstone of the new system, because it will lead to the development of a common law of sentencing"); Paul

J. Hofer, *Discretion to Depart after Koon v. United States,* 9 Fed. Sent'g Rep. 8, 11 (1996) (discussing departures as part of SRA's "model of collaborative policy development, in which the Commission's rules would evolve through a process of appellate review"); Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L. Rev. 1, 45 (Fall 1988) (indicating that in the "initial set of guidelines" the Commission did not intend to limit judicial departures, but intended that courts treat each guideline as carving out a "heartland" and consider whether conduct in the case at bar is significantly outside the norm.).

likewise not picking a number out of the air, but keying what I do, to the extent possible, with the sentences and reasoning of other judges, and the evidence that I have been given. Finally, I write decisions so that my reasoning is clear and may usefully serve as precedent to others.

## I. FACTS

### A. Offense Conduct

Whigham, Gerrod Brown, and Myles Haynes were charged with distributing crack cocaine within 1000 feet of a public housing project (21 U.S.C. § 841(a)(1); 21 U.S.C. § 860), and aiding and abetting (18 U.S.C. § 2).

The defendants dealt crack in the Bromley–Heath Housing Development in Jamaica Plain, which was a target of a joint state/federal investigation known as "Operation Brick House." Some of the drug dealing may have been associated with the activities of the "Heath Street Gang." However, there was absolutely no indication—no charge, no evidence—that Whigham was a gang member.

The sting worked as follows: The government sent cooperating witnesses to make cocaine purchases, and audio and video recorded the conversations the witnesses had with drug dealers. In each of the purchases at issue, a witness walked up to Whigham and asked for crack cocaine. Whigham then spoke to and received drugs from a supplier—Brown on March 31, 2006, Haynes on May 11, 2006, and an unknown supplier on May 12, 2006—and passed the drugs on to the witness. Whigham, in effect, was the middleman. He sold .85 grams of crack on March 31, 2006, 1.8 grams of crack on May 11, 2006, and 2.1 grams of crack on May 12, 2006, for a total of 4.75 grams. The witness conducted four other uncharged deals with Whigham, on March 30, 2006, April 10, 2006, April 11, 2006, and June 5, 2006, for a total of approximately 5.5 grams of crack in addition to the 4.75.

### B. Defendant's Background

The defendant is 46 years old and has lived with his mother in the Bromley–Heath Housing Project for his entire life. Although he experienced no abuse at home, he was exposed to violence and drugs at a young age. In 1977, Whigham saw a friend get shot in the head while standing next to him. Some time later, a drive-by shooter shot Whigham in the leg.

It was also clear that Whigham had severe mental deficits. He was in special education since age nine. At that time, he was placed in the New England Home of Little Wanderers and participated in a day program for troubled children. Estimates of his intelligence show a gradual decline; he was not developing cognitively at a rate consistent with his peers. While he excelled in basketball, he was not able to function adequately in any other arena—no meaningful employment, significant relationship, etc. The defense experts concluded Whigham's academic skills are at approximately a first grade level. The government's expert agreed that "Mr. Whigham meets diagnostic criteria for Borderline Intellectual Functioning."

Over time, Whigham developed substantial drug addictions. The defendant began drinking and smoking marijuana at age 15 and snorting cocaine at age 17. He started smoking crack at age 25. At the time of his arrest, he smoked approximately one gram of crack each weekend. He participated in one substance abuse program in 2004, and he has expressed interest in substance abuse and mental health treatment in the future. The best explanation for his dealing crack is to feed his own addiction.

Whigham has five children with four different mothers. His children are now 30, 28, 25, 18, and 11. The defendant owes a significant amount of money in overdue child support. One of the elder Whigham's ex-girlfriends obtained a one-year abuse prevention order against him in 2003. Indeed, one of his children, Kenneth Whigham, Jr., was a defendant in a related case.

Whigham's detention however, showed a different side. While detained on these charges, he helped prevent a fellow detainee's suicide on September 28, 2008.

## II. GUIDELINE CALCULATION

Quantity of cocaine base:

| Count | Date | Amount |
| --- | --- | --- |
| 1 | 3/31/06 | 0.85 grams |
| 2 | 5/11/06 | 1.80 grams |
| 3 | 5/12/06 | 2.10 grams |
| Relevant Conduct | 3/30/06 | 0.99 grams |
| Relevant Conduct | 4/10/06 | 1.80 grams |
| Relevant Conduct | 4/11/06 | 1.00 grams |
| Relevant Conduct | 6/5/06 | 1.70 grams |
| Total | | 10.24 grams |

10.24 grams of cocaine base corresponds to a level 24 under § 2D1.1, but an enhancement[5] applies because of the sales' proximity to a public housing project.

> *Total offense level without career offender provisions:* 23
>
> 24 At least 5 grams but less than 20 grams of cocaine base, § 2D1.1(8)

+2 Distribution within 1000 feet of a public housing project, § 2D1.2(a)(1)

-3 Acceptance of responsibility, § 3E1.1

*Total offense level with career offender provisions:* 31

34 Offense with statutory maximum of 25 years or more

-3 Acceptance of responsibility, § 3E1.1

*Criminal history:* 19 points, Category VI

*Guidelines range without career offender provisions:* 92–115 months

*Guidelines range with career offender provisions:* 188–235 months

I accept the Guideline calculation but as all parties agree, the Guideline range should not apply to the case at bar.

## III. WHETHER THE GUIDELINES APPLY

### A. Quantity Is Not an Appropriate Measure of Culpability Here

■ Notwithstanding differences between the offenders in the Bromley Heath sweep in terms of the quantity of drugs they were found with, most were street dealers at essentially the same level. The specific amounts with which they are charged reflected how many times the police undercover agents or cooperating witnesses sought to buy drugs from them, or how long the investigation was, not anything intrinsic to their role in the offense.[6] As I said in *United States v. Ennis,* 468 F.Supp.2d 228, 230 (D.Mass.2006), "[I]n some cases, the quantity of drugs the government would attribute to the defendant under U.S.S.G. § 2D1.1 is entirely fortui-

---

**5.** As a technical matter, the 2 points are not an "enhancement," but instead part of the base offense level. § 2D1.2(a)(1) provides that the base offense level is "2 plus the offense level from § 2D1/1 applicable to the quantity of controlled substances directly involving a protected location. . . ." Of course,

this is functionally equivalent to a base offense level of 24 and a 2 point enhancement.

**6.** In the instant case, the government waited six months until arresting Whigham, from the first sale on March 31, 2006, to his arrest in September 2006.

tous. It correlates only with the happenstance of the timing of the government's surveillance, the particular drug quantities they happen to see or [heard discussed.]"

Indeed, that quantity may or may not be consistent with the defendant's actual role in the offense. *See, e.g.,* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines,* 40 Am. Crim. L. Rev. 19, 70–72 (2003). While the Guidelines permit an adjustment for "role" in the offense, those adjustments are often minimal—two or three points—and hardly offset the substantial impact of quantity in the other direction. *Id.* By overemphasizing easily quantifiable aspects of harm (quantity or loss), and underemphasizing factors like the offender's role or state of mind, "important moral questions of culpability are relatively neglected." *Id.* at 70. Thus, as I noted in *Ennis,* it is not at all unusual to find that a messenger who earns only a small percentage of the profits from a given drug transaction starts at the same offense level as the dealer who stood to gain millions of dollars, or an addict dealing to feed his addiction treated the same as a dealer who preys on addicts. 468 F.Supp.2d at 230.[7]

**B. The 100–1 Ratio in the Guideline in Effect at the Time of Whigham's Sentencing was Inappropriate**

■ The impact of drug quantity on Whigham's sentence is exacerbated in crack cocaine cases. At least until the most recent Guideline and Congressional amendments, the statutory scheme and the Guidelines treated crack 100 times more severely than powder cocaine. *See* 21 U.S.C. § 841 (2009); U.S.S.G. § 2D1.1 (2009). I reject that treatment. I have sentenced offenders charged with crack cocaine distribution at the 1:1 ratio but I have not written decisions on this subject; post *Booker* sentencing, it appeared, did not necessarily require them. After all, a judge could accept the extraordinarily severe Guideline range, then determine that it did not meet the purposes of sentencing in an individual case—it rarely did—and sentence accordingly.

The Supreme Court's decisions in *Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) and *Spears v. United States,* 555 U.S. 261, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009), however, disapprove of that approach. In *Kimbrough,* the Court held that under *Booker,* the cocaine Guidelines, like all others, are only advisory and as such "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." 552 U.S. at 89, 128 S.Ct. 558. Nevertheless, the Eighth Circuit in *Spears* reversed the district court for sentencing the defendant using a 20:1 crack to powder ratio, holding that, notwithstanding *Kimbrough,* the District Court "may not categorically reject the ratio set forth by the Guidelines." *United States v. Spears,* 533 F.3d 715, 717 (2008) (en banc). The court may vary in an individual case but may not "categorically" reject a Guideline.

■ The Supreme Court reversed. A district court may indeed disagree categorically with a Guideline, and in particular,

---

**7.** Quantity, in short, may or may not be an appropriate proxy for culpability. It depends upon the circumstances of the offense; the lifestyle of the offender. In *United States v.*

*Cabrera,* 567 F.Supp.2d 271 (D.Mass.2008), Cabrera was homeless, living out of his car. He was a delivery man, literally caught "holding the bag."

the crack cocaine Guidelines, Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role." *Spears,* 129 S.Ct. at 843 (quoting *Kimbrough,* 552 U.S. at 89, 128 S.Ct. 558). Moreover, the power to reject the crack to powder ratio necessarily includes the power to apply a different ratio which corrects the disparity, particularly where based on the decisions of other courts, and indeed the Commission's own crack cocaine reports. *Spears,* 129 S.Ct. at 844. And the Court added:

> The alternative approach ... would likely yield one of two results. Either district courts would treat the Guidelines' policy embodied in the crack-to-powder ratio as mandatory, believing that they are not entitled to vary based on 'categorical' policy disagreements with the Guidelines, or they would continue to vary, masking their categorical policy disagreements as 'individualized determinations.' The latter is institutionalized subterfuge. The former contradicts our holding in *Kimbrough.* Neither is an acceptable sentencing practice.

*Id.*

By not dealing squarely with the crack-cocaine ratio, and particularly, by not doing so in an opinion, I—and my colleagues—run the risk of the kind of "institutionalized subterfuge" about which the Supreme Court warned. This decision is intended to make my position clear.

I will apply a 1:1 ratio for all crack cocaine sentencings. In doing so, I adopt the reasoning of Judge Bennett in *United States v. Gully,* 619 F.Supp.2d 633 (N.D.Iowa 2009) and Judge Friedman in *United States v. Lewis,* 623 F.Supp.2d 42 (2009). Judge Bennett reviewed the history of the crack/powder disparity, the Supreme Court decisions on the issue, the positions taken by the Sentencing Commission itself on the illegitimacy of the

ratio, and the change adopted by the Sentencing Commission in 2007 which did not fully remedy the problem—a history I will not revisit here. And as Judge Bennett and Judge Friedman concluded, any disparity between crack and powder sentences is inappropriate for the following five reasons:

> (1) the current cocaine Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role," [citing to *Kimbrough* and *Spears* ]; (2) the assumptions about the relative harmfulness of crack and powder cocaine have not been borne out by the evidence; (3) the crack/powder disparity perversely tends to punish lower-level dealers more harshly than major traffickers because imported powder cocaine is converted into crack at a lower level in the trafficking hierarchy; (4) the 20–to–1 ratio [which Judges Friedman and Bennett previously adopted] "still improperly uses the quantity ratio as a proxy for various kinds of harm and violence that may or may not come with trafficking of crack cocaine in a particular case,"; and (5) the crack/powder disparity fosters disrespect for and mistrust in the criminal justice system because of its disproportionate impact on African American defendants.

*United States v. Lewis,* 623 F.Supp.2d at 46 (citing to *Gully,* 619 F.Supp.2d 633).

Indeed, support for the elimination of any disparity between crack and powder comes not only from the Commission in its first report on the crack/powder disparity, United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (Feb. 1995), *available at* http://www.ussc.gov/crack/exec.htm, but also from the more recent testimony of Assistant Attorney General Lanny Breuer before the Subcommittee on Crimes and Drugs of the Untied States

Committee on the Judiciary, cited in *Lewis*, 623 F.Supp.2d at 46, and that of Judge Reggie B. Walton, testifying on behalf of the Judicial Conference, *id.*

Critically evaluating the crack/cocaine ratio in terms of its fealty to the purposes of the Sentencing Reform Act is not optional. It is not something that a judge has discretion to do or not to do. The Supreme Court in *Kimbrough* and *Spears* held that an advisory Guideline system required it. And the Court took that position in the face of the government's argument—not unlike the one it is making here—that "if district courts are permitted to vary from the Guidelines based on their disagreement with the crack/powder disparity, defendants will receive markedly different sentences depending on the particular judge drawn for sentencing." *Kimbrough*, 552 U.S. at 88, 128 S.Ct. 558. The Court's response to the government's alarm was direct-appellate review and precedent. *Id.* at 107, 128 S.Ct. 558 ("[A]dvisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help to 'avoid excessive sentencing disparities.'").

If the instant charge were powder (and the defendant were not a career offender), the guideline calculations would be 30 to 37 months and not 92–115 months. There is absolutely no justification for the difference, as a general matter, and surely none in the case at bar.

## C. Role

Whigham was a street dealer, nothing more, nothing less. He did not even have a consistent source of supply of drugs. When he found purchasers he had to hustle to find a supplier. More significant, he made little or no money. In fact, defense counsel suggested that if he could obtain social security payments, given his disabilities, he would not deal drugs.

The Guidelines undervalue just how minor a crack dealer's role is. The U.S. Sentencing Guidelines Manual § 3B1.2 cmt. nn. 2–3 restricts role adjustments to offenses involving more than one participant. Crack distribution is lateral; each is an independent contractor, not part of a hierarchy as in cocaine distribution. As I noted in *Garrison:*

> In many drug conspiracies, especially those involving gangs, there is a strict hierarchy—the source, the packager, the wholesale distributor, the retail distributer. *See, e.g.,* Steven D. Levitt & Sudhir Alladi Venkatesh, *An Economic Analysis of a Drug–Selling Gang's Finances,* 115 Q.J. Econ. 755 (2000) (describing allocation of organization responsibilities, risk and financial reward, and noting that street-level dealers face greater risk for diminished gain).

560 F.Supp.2d at 87. *See also Haynes,* 557 F.Supp.2d at 206. Thus, while crack dealers like Whigham are de facto at the bottom of the drug hierarchy, the Guidelines do not treat them as such. I will take Whigham's role into account in fashioning my sentence.

## D. Career Offender Guidelines

While there is no question that Whigham is a Career Offender under the Guidelines, § 4B1.1, there is also no question that the career offender guidelines are flawed. The offenses that put Whigham in the career offender category are drug offenses—low level, litigated largely in the district court,[8] without violence or guns. As I have said elsewhere, there are career

---

8. Only one charge of Mr. Whigham's was deemed serious enough to be tried in Superi- or Court.

offenders and there are *career offenders*. *See Ennis*, 468 F.Supp.2d at 235. There are offenders who qualify for career offender treatment because of a life of violent crime. There are others who meet the Guidelines standard, like Whigham, because of a series of very minor drug charges.

Long before *Booker*, the case law recognized that in many cases the career offender guidelines in fact overstated a defendant's culpability; that it swept into one category wholly dissimilar offenders, such as drug offenders who have a much lower recidivism rate than violent offenders. *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 134 (2004). *See also United States v. Pruitt*, 502 F.3d 1154, 1168 (10th Cir.2007) (McConnell, J. concurring) (noting that the report's conclusions "might appear to be an admission by the Commission that this guideline, at least as applied to low-level drug sellers . . . violates the overarching command of § 3553(a)."); *United States v. Woodley*, 344 F.Supp.2d 274, 278 (D.Mass.2004); *United States v. Lacy*, 99 F.Supp.2d 108, 121 n. 27 (D.Mass.2000)(describing the extensive use of departures in dealing with the career offender Guidelines).

While 28 U.S.C. § 994(h) directed the Sentencing Commission to promulgate the career offender provisions, Whigham is hardly the kind of individual that Congress had in mind. Congress' directive for a harsh career offender penalty—as applied to a drug felony—was very clearly aimed at "drug trafficking offense[s]" involving large amounts of narcotics. *See* S.Rep. No. 98–225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, at 3196. Their targets were those making substantial amounts of money who were flight risks because they could easily post "bond in the hundreds of thousands of dollars" and flee to a country where they "have established substantial ties outside the United States from whence most dangerous drugs are imported." *Id.* at 3203. Whigham does not remotely fit this portrait. He is a petty dealer, making little or no money, who returns to Bromley Heath over and over again for one reason: He has nowhere else to go.

### E. Mental Deficiencies

Under U.S.S.G. § 5K2.13, a departure was available where the defendant had "significantly reduced mental capacity," which meant that he has "a significantly impaired ability to control behavior that the defendant knows is wrongful." *United States v. Shore*, 143 F.Supp.2d 74, 80 (D.Mass.2001). The problem was the Commission decided to exclude from the departure category circumstances in which the "significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants." 5K2.13. Post-*Booker*, however, I am obliged to look critically at the Guidelines in relationship to the purposes of sentencing. And in § 5K2.13, I find another Guideline without explanation, data or justification.

Here, where Whigham has severe mental deficits, that certainly had a substantial bearing on his behavior, even if exacerbated by his addictions; it should be considered in fashioning his punishment.

### F. 18 U.S.C. § 3553(a)

#### 1. Need for Similar Sentences with Codefendants

In *Garrison*, which involved a drug sweep of a different neighborhood than here, I noted:

In a regime that purports to value similar treatment for similarly situated individuals, the fact that Garrison's sentencing could have proceeded without

considering the other men involved in the same sweep was troubling. Surely some of these individuals—non-violent street dealers, arrested at or near the same time, part of the same investigation—were presumptively similarly situated with Garrison. While the Federal Sentencing Guidelines did not ask about these other individuals—clearly, a flaw—I did.

560 F.Supp.2d at 84. The Guidelines, I noted, define "similarly situated" only with reference to the particular guideline categories. If the guideline categories are badly over broad, the approach makes no sense. For example,

> In a regime that purports to value similar treatment for similarly situated individuals, the fact that Garrison's sentencing could have proceeded without considering the other men involved in the same sweep was troubling. Surely some of these individuals—non-violent street dealers, arrested at or near the same time, part of the same investigation—were presumptively similarly situated with Garrison. While the Federal Sentencing Guidelines did not ask about these other individuals—clearly, a flaw—I did.

560 F.Supp.2d at 84. The Guidelines, I noted, define "similarly situated" only with reference to the particular guideline categories, a deeply flawed approach. For example,

> If a defendant had an offense level of 14 and a criminal history of I, the Guidelines assumed that you were similarly situated to other 14s and Is. But in this case—and perhaps many others—that is a false assumption. Similarly situated with respect to the Guideline categories does not necessarily mean similarly situated with respect to the defendant's actual role in the criminal endeavor or his real culpability. The individual supply-

ing the drugs, for example, could have been a first offender, with a criminal history I, not because he had been crime-free all of his life but because he did not "do" street drug deals and thus rarely encountered government agents. And the reverse, an offender with a high criminal history score, could have been caught in this drug sweep even when his drug dealing was episodic, when he had tried to change the direction of his life. The numbers—the Guideline computation—could mask real differences between offenders, in effect, a "false uniformity." Sandra Guerra Thompson, The Booker Project: The Future of Federal Sentencing, 43 Hous. L. Rev. 269, 275 n. 25 (2006); Michael M. O'Hear, The Myth of Uniformity, 17 Fed. Sent'g Rep. 249 (2005). It is especially important, now that the Guidelines are advisory, that judges are charged with looking beyond the Guidelines categories and that they know what their colleagues have done in comparable cases. The new discretion will be influenced, as it should be, by the precedents of the court: a true common law of sentencing.

560 F.Supp.2d at 84–85.

If I am to be concerned under the Sentencing Guidelines with similarly situated offenders who have been accused of similar conduct, it seems to me that the best place to look is to the people who have been arrested in the same sweep, in the same place, at the same time, largely charged with doing the same thing. *See, e.g.,* Ryan Scott Reynolds, *Equal Justice Under Law: Post–Booker, Should Federal Judges Be Able to Depart From the Federal Sentencing Guidelines to Remedy Disparity Between Codefendants' Sentences?,* 109 Colum. L. Rev. 538 (2009) (concluding that *Booker* permits judges to consider codefendant disparity under § 3553(a)(6)).

Of all the individuals who were sentenced as part of this Bromley–Heath sweep (see Table 1), there are those who are clearly the very least culpable, street dealers who had little or no record, surely nothing approaching the Guideline "career offender" category. Haynes, Barrows, and Brown each received the 12 month mandatory minimum for distributing crack cocaine in a protected area.[9]

At the other end were those, like Garcia, Carrasquillo and Garrasteguy, who received at least the mandatory minimum sentence of ten or fifteen years.[10] Each had evidence of drug dealing far more substantial than in the case at bar, the drug quantities triggering the statutory mandatory minimum sentence, in addition to violent records.

In between were individuals with substantial criminal records, including records for violence, mainly in the career offender category, who received substantial sentences although only one within the guideline range.[11] In looking at the other defendants, and the materials supporting their sentences, Whigham compares most to Luis Ramon Ortiz on the one hand, whom I sentenced, and Keith Allen, sentenced before another judge. Allen was sentenced to 84 months, which was a substantial reduction from the 188–235 months (base offense level 19 and criminal history IV, increased to 31 and VI because of his career offender status). The Court did so because of Allen's substantial rehabilitation in prison and mental health issues. Significantly, Allen had some violence in his background, namely an attempted rape and an assault and battery with a dangerous weapon.

Ortiz also was a career offender, although I concluded that Ortiz's Criminal History Category VI clearly overstated his criminal history. He had an assault and battery conviction at age 22 but was crime-free for nine years. (At the time of sentencing, he was 32.) Two of his earlier offenses triggered the career offender enhancement; nothing comparable occurred during the intervening period. While his guideline range was the same as that of Allen, 188–235 months, I sentenced him to 53 months of imprisonment.

Mr. Whigham's case sits somewhere in between Allen and Ortiz. He has a longer record than Allen, and unlike Ortiz, a rec-

---

**9.** Haynes received thirteen months, which was time served.

**10.** Carrasquillo received eleven years.

**11.** Troy Bishop's Total Offense Level was 34 and Criminal History Category VI and he was a career offender. The guideline range was 262 to 327 months. He was sentenced to 92 months. In Bishop's sentencing memorandum, Bishop's counsel argued:

> The defendant's physical condition is sufficiently serious to qualify him for a non guideline sentence. He was the innocent victim of a gunshot wound in 1996 and has been paralyzed from his abdomen down since that time. His physical condition requires constant professional medical help.

Robert Loving's Total Offense Level was 31 and Criminal History Category V. He too was a career offender producing a guideline range of 188 to 235 months of imprisonment. He *was sentenced to 120 months.* The court explained:

> The offense of conviction involved .65 grams of crack cocaine which would normally yield a sentence of 33–41 months. The application of the Career Offender Guidelines increase that range six fold, *188—235 months. I deem a sentence of 188 months for possession of .65 grams* extraordinary and excessive. The sentence imposed, 120 months, is still a long sentence and it is appropriate to both the offense and the criminal record.

Jameel Gibbons' Total Offense Level was 23 and Criminal History Category VI producing a guideline range of 92 to 115 months of imprisonment. He was not a career offender. He was sentenced to 92 months followed by 72 months of supervised release.

ord of consistent law breaking, but, in contrast to both, it is a non violent record. In effect, it is the record of someone who has nothing in his life, no employment, no education, borderline intelligence, dealing crack because that seems to be all he can do.

## 2. Public Safety

The government paints a troubling picture of the Bromley Heath project, with drug dealing, gang related violence and murder. It argues that public safety demands that these individuals be arrested, and that there be swift and sure punishment. But while that approach underscores the need for punishment, it does not help identify how much. Whether public safety demanded the nearly ten years the government calls for is the question.

As I noted in sentencing a codefendant Myles Haynes, *United States v. Haynes*, 557 F.Supp.2d 200, 202–203 (D.Mass.2008), if anything, studies have suggested that public safety demands reconstituting these communities, not by taking people off the street for ten or fifteen years only to be replaced by younger, often more violent, dealers, but that we try to combine punishment with the other purposes of sentencing. As I noted,

> While public safety certainly calls for the incapacitation of some, there is another side to the equation, which, after *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), may finally be given the serious consideration it deserves. The facts presented*203 by Haynes' case force the Court to confront the inescapable fact that disadvantaged communities like Bromley–Heath are injured both by crime and by the subsequent mass incarceration of their young men. See Donald Braman, Criminal Law and the Pursuit of Equality, 84 Tex. L. Rev. 2097, 2114–17 (2006). Compare Randall Kennedy, Race,

Crime, and the Law 373–76 (1997), with Todd R. Clear, Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Neighborhoods Worse (2007). Courts may no longer ignore the possibility that the mass incarceration of nonviolent drug offenders has disrupted families and communities and undermined their ability to self-regulate, without necessarily deterring the next generation of young men from committing the same crimes.

*Id.* at 202–203.

## G. Ryan Scott Article

Professor Scott has studied Massachusetts sentencing to evaluate inter-judge sentencing disparity. (He has focused on Massachusetts because we are the only district court that makes key sentencing documents available to the public.) He concluded that the data showed an increase in inter-judge sentencing disparity both in sentence length and in the judge's approach to the Guidelines. As to the latter, the approach to the guidelines that he evaluates is the frequency of sentencing outside of the Guideline levels.

Inter-judge disparity is of course a serious matter, and Professor Scott's article is helpful in flagging it. But his conclusions are flawed, particularly at this time. The Commission described the problem, as follows:

> Fair sentencing is individualized sentencing. Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing.

United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal

Criminal Justice System is Achieving the Goals of Sentencing Reform 113 (2004).

The extent of judicial "compliance" with the Guidelines is not a good measure of *unwarranted* disparity post-*Booker* as Professor Scott suggests. Judges are supposed to sentence outside the guideline range when the range is greater than necessary or insufficient to meet the purposes of sentencing. This is especially so in career offender/crack cocaine cases, like the instant one. Variances from the Guidelines are frequent in this group precisely because the career offender and crack cocaine guidelines are far too severe, clearly overbroad, and, in the case of the crack guideline, have a profoundly disparate impact on African American offenders.

In effect, an outside the guideline sentence may not be optional; it may well be essential to prevent both unwarranted disparity and unwarranted uniformity. Under the Guidelines, for example, the supplier of cocaine who does his dirty work through street dealers will have little or no criminal record; he may be treated less severely than individuals to whom he sells for street distribution who necessarily have frequent encounters with the police. Likewise, the courier who carries the drugs from the money source to the drug source, may be treated virtually the same (with minor role adjustments) as the people from whom he is taking direction and who stand to gain millions. As Judge Gleeson noted (in a different context) in *United States v. Ovid*, 2010 WL 3940724, *7 (E.D.N.Y.), "the fact that two fraud defendants have similar or even identical *Guidelines ranges* does not necessarily mean they committed similar offenses."

Variances also occur because mitigating factors like mental health, age, addiction can now be—and should be—considered. *See Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The addict who deals to support his addiction should be punished, but surely not as much as the non-addicted dealer who preys on the addict's vulnerabilities.

In addition, variances are necessary to adjust for unwarranted disparity resulting from prosecutorial decisions, the decision to charge a mandatory minimum offense, rather than a non mandatory minimum offense, to proceed to prosecute after three drug transactions, rather than wait for four, etc., to make charging decisions to satisfy the community view of the gravity of certain offenses rather then others. *See* John Gleeson, *The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentence Bargains*, 36 Hofstra L. Rev. 639, 656 n. 66 (2008) ("Some drug couriers get a four-level downward role adjustment based on the happenstance of being arrested in New York rather than in Miami, just as some illegal immigrants get a three level fast-track adjustment based on the happenstance of being arrested in Arizona rather than Utah"); Michael M. O'Hear, *National Uniformity/Local Uniformity: Reconsidering the Use of Departures to Reduce Federal–State Sentencing Disparities*, 87 Iowa L. Rev. 721, 741–43 (2002) (explaining why federal-state disparities should be considered at sentencing.).

In any event, it would be wrong to suggest as did Professor Scott, that inter-judge disparity raises the same kind of concerns post-*Booker* as it did prior to the Sentencing Guidelines. Prior to the Sentencing Guidelines, judges could impose a sentence for any reason or for no reason at all and their decisions were not reviewable on appeal. Post-*Booker* judges must state their reasons to satisfy both the public and the appellate courts. Moreover, the Guidelines provide an important starting point for analysis, a framework. *See*

Judge Nancy Gertner, *Supporting Advisory Guidelines,* 3 Harv. L. & Pol'y Rev. 261, 270 (2009) (describing continued guidelines sentencing as the result of "the habits ingrained during twenty years of mandatory Guideline sentencing," and noting that "after the Sentencing Reform Act (SRA), judges were trained only in the Guidelines"). To the extent that the judges in the Bromley Heath sweep vary from the Guidelines it was not because of personal preferences, but rather real, substantial, jurisprudential disagreements with the Guidelines, the kind highlighted by the Supreme Court in *Kimbrough* and *Spears.* True unwarranted disparity can be reduced only when judges follow the guidelines that are consistent with the statutory purposes, and vary when they do not.

In time, these disagreements will be resolved by the appellate courts, or the Supreme Court, and/or the Commission. In the meanwhile, the judges of this Court meet and discuss our sentencing approaches, write opinions, and share insights from the case law. Professor Scott's analysis is a helpful first step in flagging the issue, but it is not remotely the last word. He acknowledged that given the flux in the post-*Booker* guideline law, the increase in inter-judge disparity is modest. And he added:

> It also bears emphasis that inter-judge sentencing disparity is but one consideration among many in evaluating the federal sentencings system. It is entirely possible to conclude that *Booker, Kimbrough* and *Gall* have improved federal sentencing, on balance, by allowing judges greater flexibility to reject unjust guidelines and impose just sentences. And there are other urgent priorities for federal sentencing reform, including the elimination of the 100:1 crack-powder ration in drug sentencing, reevaluation of mandatory minimum sentences, and confronting unwarranted disparity created by prosecutory charging and bargaining practices.

Scott, *Inter–Judge Sentencing Disparity After Booker, supra,* at 31.

Thus, it is simply not the case that sentencing precisely according to the Guidelines promotes the SRA's concerns about unwarranted disparity. Indeed, just the opposite. Chief Judge Robert Hinkle said it best in a February 11, 2009, hearing before the United States Sentencing Commission:

> It is better to have five good sentences and five bad ones than to have ten bad but consistent sentences. And it would be better still to have ten good sentences.

*available at* http://www.ussc.gov/AGENDAS/20090210/Hinkle_statement.pdf.

In my judgment, Whigham's sentence fits into the latter category. I sentenced Whigham to 60 months on each count to be served concurrently. I recommended that he be sentenced to a facility in the New England area with the 500 hour Residential Drug Abuse program. I sentenced him to six years of supervised release during which Probation was to assist him in applying for social security benefits, if he qualified, and he was to participate in a drug or mental health treatment program. He was only permitted to enter the Bromley Heath housing project to visit his family and only with advance permission of Probation.

This sentence fully comports with the requirements of 18 U.S.C. § 3553(a); it is a serious sentence, provides adequate punishment, avoids unwarranted sentencing disparities, and enables the Court to effect rehabilitation to the extent possible.

**SO ORDERED.**