**UNITED STATES of America**

v.

**Edward GARDNER, a/k/a "Alex," and Kenroy Gladden, a/k/a "Kenroy Flowers," a/k/a "Michael Richardson," Defendants.**

**No. 07 Cr. 1229(JSR).**

United States District Court,
S.D. New York.

Signed May 20, 2014.

Avi Weitzman, David Andrew O'Neil, Jennifer Eileen Burns, Michael Douglas

Maimin, Nola Breglio Heller, United States Attorney's Office, New York, NY, for Plaintiff.

Curtis Jordan Farber, Curtis Farber, Esq., New York, NY, Devin McLaughlin, Langrock Sperry & Wool, LLP, Middlebury, VT, Murray Richman, Law Offices of Murray Richman, Bronx, NY, for Defendants.

## OPINION AND ORDER

JED S. RAKOFF, District Judge.

Pending before the Court is the resentencing of defendants Edward Gardner and Kenroy Gladden following a vacatur and remand of their sentences by the Second Circuit in light of *Dorsey v. United States*, —— U.S. ——, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012). *See* Mandate, December 3, 2012, ECF No. 57. The initial question presented on remand is whether, in calculating the defendants' range under the U.S. Sentencing Guidelines (the "Guidelines"), the Court should apply the Guidelines' provision by which, for sentencing purposes, the weight of the cocaine involved in any offense involving "crack" cocaine is multiplied by a factor of 18. Finding that this multiplier is unsupported by fact, law, or policy, the Court declines to apply it to the sentences in this case.

■ Although the defendants here each face substantial mandatory minimum sentences, the Court, on this remand, must, "as a starting point and initial benchmark," calculate anew the applicable Guidelines range for the offenses of conviction. *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). On April 30, 2013, at an initial hearing following remand, the Court made a finding that the defendants' offenses of conviction involved at least 3.6 kilograms of cocaine base (commonly known as "crack cocaine"), but raised questions about whether the amount

should be subject to a multiplier. *See* Tr., 4/30/2013, at 11. While, with respect to all offenses involving illegal drugs, the quantity of the drugs is, by far, the single most important component in calculating the applicable Guidelines range, in the case of crack cocaine, but not powder cocaine, the actual quantity is multiplied by a factor of 18. *See* U.S.S.G. § 2D1.1(c). Since crack and powder cocaine are simply two forms of the same chemical substance having "the same physiological and psychotropic effects," *Kimbrough v. United States*, 552 U.S. 85, 94, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), this discrepancy is suspect on its face.

Accordingly, the Court, at the April 30 hearing, solicited supplemental briefing from the parties on the issue of what empirical basis, if any, justifies the Guidelines' disparate treatment of crack and powder cocaine. Having reviewed these supplemental submissions, and having had the benefit of further oral argument, the Court finds that there is insufficient support, empirical or otherwise, for this substantial disparity.

The parties agree that the 18:1 ratio of crack to powder cocaine makes a huge difference in the defendants' Guidelines range. If the ratio is here applied, the base offense level for the defendants' crimes is 36. *See* U.S.S.G. § 2D1.1(c)(2). Given the defendants' uncontested criminal history category of II, and assuming no other adjustments, the defendants' Guidelines range would be 210 to 262 months' imprisonment. *See* U.S.S.G. ch. 5, pt. A (Sentencing Table). By contrast, were the 3.6 kilograms of crack cocaine treated simply as powder cocaine, the total offense level would be 30, and the corresponding Guidelines range would be 108 to 135 months' imprisonment, or roughly half of

the imprisonment recommended under the 18:1 ratio.[1]

A brief review of the relevant background makes clear how little, if any, this disparity has to do with any objective difference between crack and powder cocaine and how much it has to do with the dead hand of history. From 1986 until 2007, the Guidelines' ratio between crack and powder cocaine was 100:1. The origin of this extraordinary disparity had nothing directly to do with scientific or empirical inquiry, but rather derived from the Sentencing Commission's reliance on the Anti–Drug Abuse Act of 1986 ("1986 Act"), Pub. L. No. 99–470, 100 Stat. 3207 (1986), which imposed certain mandatory minimum sentences that could be read to reflect, in effect, a 100:1 ratio between crack and powder cocaine. *See, e.g.,* 21 U.S.C. 841(b)(1)(A) (2008) (imposing a ten-year mandatory minimum sentence for distributing *either* 50 grams of crack cocaine *or* 5 kilograms of powder cocaine). Although the 1986 Act dealt only with mandatory minimum sentences, the Sentencing Commission "responded to the legislation by ... extrapolating upward and downward to set ... ranges for all drug quantities." United States Sentencing Comm'n, Report to Congress: Cocaine and Federal Sentencing Policy 3 (May 2007) ("2007 Report"). *See also* United States Sentencing Comm'n, Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 53–54 (Oct.2011). In so doing, the Commission, in the words of the Supreme Court, departed from its "characteristic institutional role" of developing sentencing recommendations based upon "empirical data and national experi-

ence." *Kimbrough,* 552 U.S. at 109, 128 S.Ct. 558.

As a consequence, the Supreme Court subsequently held in the *Kimbrough* case, *supra,* that it would be no abuse of discretion for a district court to conclude, "even in a mine-run case," that the 100:1 disparity might yield a sentence that contravenes the overall policies of federal sentencing mandated by Congress in 18 U.S.C. § 3553(a). *Id.* at 109, 128 S.Ct. 558. The Court further clarified in *Spears v. United States,* 555 U.S. 261, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009), that a district court's variance from this disparity could be "categorical" in nature, rather than tied to the specifics of the individual case, and that the district court retained "authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them." *Id.* at 264, 129 S.Ct. 840. As the Court further stated: "[a] sentencing judge who is given the power to reject the disparity created by the crack-to-powder ratio must also possess the power to apply a different ratio which, in his judgment, corrects the disparity. Put simply, the ability to reduce a mine-run defendant's sentence necessarily permits adoption of a replacement ratio." *Id.* at 265, 129 S.Ct. 840.

In the instant case, the Government concedes that these holdings are equally applicable to the 18:1 ratio. *See* Mem. Regarding the Application of the Guidelines to Offenses Involving Crack Cocaine ("Gov. Mem."), Dkt. No. 60, at 3. But, to continue the history, the Sentencing Commission, even before *Kimbrough* and *Spears* were handed down, recognized its earlier mistake and recommended in 1995 that Congress remove the disparity altogether, es-

---

1. The Court here discusses only the recommended Guidelines range for the defendants' drug counts. An additional, mandatory consecutive 60 months is added to each defendant's sentence because of their conviction of violating 18 U.S.C. § 924(c). *See generally* Mem. Order & Judgment of Dec. 28, 2011, ECF No. 53, 837 F.Supp.2d 346, at 348–49 (S.D.N.Y.2011).

tablishing instead a 1:1 ratio between crack and powder cocaine. This, the Sentencing Commission concluded, should be done even assuming, arguendo, that crack cocaine, in comparison to powder cocaine, might produce a more rapid "high," might be conducive to more addictive behavior, and might even be associated with more violence, because, in the Commission's view, such effects, if any, materially varied in individual cases and hence could be better dealt with by the application of specific enhancements to individual defendants rather than by imposing an across-the-board disparity between crack and powder weights. *See* United States Sentencing Comm'n, Special Report to Congress: Cocaine and Federal Sentencing Policy vi–xv (Feb.1995) ("1995 Report"). Congress, however, in its wisdom, promptly vetoed the Commission's recommendation. *See* Pub. L. 104–38, § 1, 109 Stat. 334.

Thereafter, the Commission made further attempts to rectify its original error, without success. Further still, the Department of Justice, in 2009, itself advocated the adoption of a one-to-one ratio, again without success. *See* Restoring Fairness to Federal Sentencing: Addressing the Crack–Powder Disparity: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary, 111th Cong. 100 (2009) (statement of Lanny A. Breuer, Assistant Att'y Gen., Criminal Div., U.S. Dep't of Justice).

Finally, however, in 2010, in what can only be regarded as a political compromise having no empirical rationale, Congress reduced the crack-to-powder cocaine dis-

parity from 100–to–1 to 18–to–1, where it currently stands. *See* Fair Sentencing Act ("FSA"), 124 Stat. 2372. Two years later, in the *Dorsey* case, *supra*, the Supreme Court held that this revision had retroactive effect for those defendants who had been convicted before, but sentenced after, the FSA was enacted—thus occasioning the instant resentencings.

Against this background, the Court turns to whether the new 18:1 ratio has any rational basis, let alone a substantial and convincing one. The supposed justifications for the original 100:1 disparity, as summarized in *Kimbrough*, were that "(1) crack was highly addictive; (2) crack users and dealers were more likely to be violent than users and dealers of other drugs; (3) crack was more harmful to users than powder, particularly for children who had been exposed by their mothers' drug use during pregnancy; (4) crack use was especially prevalent among teenagers; and (5) crack's potency and low cost were making it increasingly popular." *Kimbrough*, 552 U.S. at 95–96, 128 S.Ct. 558. But the last three of these five suppositions were subsequently discredited to the point that the Government does not pursue them here but instead relies principally on the first two claims, that crack cocaine is more addictive than powder cocaine and that it is more associated with violence.[2]

As to the former, this argument was effectively refuted in the Commission's own 2007 Report to Congress, which concluded that pharmacologically "both forms cause identical effects." 2007 Report, at 62. While the Report noted the possibili-

---

**2.** The Government also contends that since crack is a "downstream" or "retail" drug, a smaller quantity of crack cocaine will approximate a much larger quantity of "wholesale" "powder cocaine." Gov. Mem. at 21. But, if anything, the fact that powder cocaine can be "cut" into a larger quantity of crack cocaine would seem to support the conclusion that distribution of "wholesale" powder cocaine should be punished more harshly than "retail" crack cocaine. In any event, the Government's vague conjecture on this point is insufficient to justify the 18:1 disparity.

ty, based largely on anecdotal evidence, that "the risk of addiction and personal deterioration may be greater for crack cocaine than for powder cocaine" since the two are administered differently, *id.* at 62, the Commission had already determined as early as 2002 that "[p]recisely quantifying this difference is impossible and, as a result, determining an appropriate degree of punishment differential to account for any difference in addiction potential is difficult," United States Sentencing Comm'n, Report to Congress: Cocaine and Federal Sentencing Policy 94 (May 2002) ("2002 Report").

At present, the claim that crack cocaine is more addictive than powder cocaine because of the way it is administered remains in the realm of conjecture, unsupported by any serious scientific study, and insufficient to support anything like an 18:1 disparity. Moreover, as the Commission also noted in its 2002 Report, "federal penalties for other major drugs of abuse that can be administered in multiple ways do not provide differentiation based on the method of administration," 2002 Report, at 94 n. 181—so why make the distinction in the case of cocaine?

As for the claim that crack cocaine is "associated" with violence, the Government has offered no scientific evidence, and the Court is not aware of any such evidence, that crack cocaine *causes* its users to engage in more violent activity than if they had used powder cocaine. Instead, the Government argues that crack cocaine distribution is more likely to be "associated" with violence than powder cocaine distribution because, according to some studies, it is sold in relatively more violent "open-air bazaars" (an apparent euphemism for street sales in poor communities). *See* Gov. Mem. at 4, 14–15; *see also, e.g.,* Richard B. Felson & Luke Bonkiewicz, *Guns and Trafficking in Crack–Cocaine and Other Drug Markets,* 59 Crime & Delinquency 319 (2013); Roland G. Fryer, Jr. et al., *Measuring the Impact of Crack Cocaine* (Nat'l Bureau of Econ. Research, Working Paper No. 11318, 2005).

The argument is entirely unconvincing. To begin with, even though, as described below, violence is somewhat more "associated" (in the sense of statistical correlation) with crack cocaine distribution than powder cocaine distribution, in the great majority of both kinds of cases, there is no violence.

Furthermore, the studies relied on by the Government cannot and do not isolate the purported impact of open-air dealing on rates of violence. *See, e.g.,* Felson & Bonkiewicz, *supra,* at 325–29; Fryer et al., *supra,* at 20–26. This is fundamental, because multiple other equally or more plausible theories exist for the (modestly) increased violence associated with crack-cocaine use and distribution. For example, it is well established that crack cocaine is preferred over powder cocaine in poor, predominantly African–American communities,[3] communities that have long tended to suffer from higher levels of violent crime.[4] More generally, one would

---

3. According to U.S. Sentencing Commission data, in Fiscal Year 2012, approximately 83 percent of federal crack cocaine offenders who were sentenced were black, while 7 percent were white and 10 percent were Hispanic. U.S. Sentencing Comm'n, 2012 Sourcebook of Federal Sentencing Statistics, tbl. 34. By contrast, only 28 percent of powder cocaine offenders who were sentenced were black, while 16 percent were white and 56 percent were Hispanic. *Id.* In addition, evidence suggests that participants in crack markets are more likely to be of lower socioeconomic status. *See* Felson & Bonkiewicz, *supra,* at 331.

4. *See, e.g.,* Alan Berube, Brookings Inst., *Concentrated Poverty in America An Overview, in The Enduring Challenge of Concentrated Pover-*

need a much more careful statistical analysis than any presented by the Government to determine whether the violence more associated with crack cocaine than with powder cocaine is a function of a multitude of socioeconomic differences, or is instead the result of some difference related to the two substances themselves or to their methods of distribution. Indeed, the only conclusion one can state with certainty is that the severe effects of the 18:1 ratio are primarily visited upon African–Americans: a disparity that would require far more conclusive evidence of a difference between crack and powder cocaine before it could be justified in terms of the purposes of 18 U.S.C. § 3553(a).

Finally, this entire discussion about violence fades into near-irrelevance when one remembers that in the overwhelming majority of offenses involving both crack and powder cocaine, there is no indication of any violence. *See* 2007 Report, at 37 (noting that, in 2005, violence was observed in 6.2% of powder cocaine cases and in 10.4% of crack cocaine offenses). And, as the Sentencing Commission noted in its 2007 Report, *supra,* if a defendant is convicted of an offense that involves violence, the Guidelines elsewhere provide for upward enhancements to his Guidelines score. *See, e.g.,* U.S.S.G. §§ 2D1.1(b)(1), (b)(2). But this has nothing to do with any difference between crack and powder cocaine.

■ In the end, the Government has failed to adduce any material evidence, legal argument, or policy justification for the 18:1 disparity. While the Court understands that the 18:1 ratio was a political compromise between the Government's proposed 1:1 ratio and those in Congress who wished to maintain the 100:1 ratio, the

Supreme Court has expressly stated that the district courts remain free to test that compromise against Congress's own overriding statement of sentencing purposes in 18 U.S.C. § 3553(a). *See Kimbrough,* 552 U.S. at 109, 128 S.Ct. 558; *Spears,* 555 U.S. at 264–65, 129 S.Ct. 840. Having done so, the Court finds no rational support for the 18:1 ratio, and consequently will apply a 1:1 ratio and will treat the quantity of crack cocaine attributed to the instant defendants' offenses of conviction as if it were the equivalent quantity of powder cocaine under the Guidelines.[5] Based on this conclusion, the parties are hereby directed to convene a conference call with the Court by no later than May 27, 2014 to schedule further proceedings in this case.

SO ORDERED.

---

*ty in America* 13–14 (Cmty. Offices of the Fed. Reserve Sys. et al. eds., 2008), *available at* http://www.frbsf.org/community-development/files/cp_fullreport.pdf.

5. Several other courts have reached similar conclusions. *See, e.g., United States v. Williams,* 788 F.Supp.2d 847 (N.D.Ia.2011); *United States v. Whigham,* 754 F.Supp.2d 239 (D.Mass.2010).